Susan B. Montgomery (AZ Bar # 020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com

Roger Flynn (Pro Hac Vice Application To Be Filed)(CO Bar # 21078)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

Allison N. Henderson (Pro Hac Vice Application To Be Filed)(CO Bar # 45088)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, Colorado 81224
(970) 309-2008
ahenderson@biologicaldiversity.org

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Mining Reform Coalition; Center for Biological Diversity; Earthworks; Concerned Citizens and Retired Miners Coalition; and Grand Canyon Chapter of the Sierra Club, <br><br> Plaintiffs, <br><br> v. <br><br> Martha Guzman, in her official capacity as Regional Administrator Environmental Protection Agency Region 9; United States Environmental Protection Agency; Michael Regan, in his official capacity as Administrator of the Environmental Protection Agency, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT for DECLARATORY, EQUITABLE, AND INJUNCTIVE RELIEF** <br><br> Pursuant to the Clean Water Act |

1

# SUMMARY OF THE CASE AND FACTUAL BACKGROUND

1. Through this action, Plaintiffs Arizona Mining Reform Coalition ("AMRC"), Center for Biological Diversity (the "Center"), Earthworks, the Concerned Citizens and Retired Miners Coalition ("CCRM"), and the Grand Canyon Chapter of the Sierra Club ("Sierra Club"), challenge the failure of Defendant Regional Administrator of the United States Environmental Protection Agency ("EPA"), and the EPA, to ensure the protection and restoration of Queen Creek, a valuable desert stream near Superior, Arizona in violation of the mandates of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1251, *et seq*.

2. More specifically, the Regional Administrator of EPA Region 9 (with jurisdiction and authority over implementation of the CWA in Arizona), Martha Guzman, has failed to establish and promulgate a Total Maximum Daily Load ("TMDL"), for copper and lead in Queen Creek, a nondiscretionary duty under the CWA that EPA has failed to meet. 33 U.S.C. § 1313(d).

3. Queen Creek will be on the receiving end of discharges from the copper mining project proposed by Resolution Copper Co. (corporate name for the joint Rio Tinto and BHP Copper "Resolution Copper Project").  This massive copper mining project will discharge significant amounts of copper and other pollutants into Queen Creek.  This is in addition to other current discharges of pollutants from other sources into Queen Creek.

4. The State of Arizona, under section 303(d) of the CWA, is required to identify its polluted waters that are not meeting applicable water quality standards for pollutants (known as impaired waters), and establish a Total Maximum Daily Load ("TMDL") for each pollutant in the water body.  A TMDL analysis must then be completed to establish baseline measurements of pollutant materials in those water bodies and to identify potential reductions needed to attain standards.

5. Queen Creek Reach No. 15050100-014A, (headwaters to the Superior Wastewater Treatment Plant discharge), has been listed on Arizona's 303(d) list as impaired for dissolved copper since 2002.  Reach No. 15050100-014B, (Superior Wastewater Treatment Plant discharge to Potts Canyon) has been listed as impaired for dissolved copper

1    since 2004.  Reach No. 15050100-014C (Potts Canyon confluence to the Whitlow Dam) has
2    been listed as impaired for dissolved copper since 2010. *See* Arizona's 303(d) List of
3    Impaired Waters. *See* Arizona Dep't of Envtl. Quality, Arizona's 2022 Clean Water Act
4    Assessment (July 1, 2012 to June 30, 2021) Integrated 305(b) Assessment and 303(d) Listing
5    Report  (revised Dec. 2021) (Arizona's current (2022) 303(d) List of Impaired Waters)
6    https://static.azdeq.gov/pn/pn_draft2022cwaa.pdf;
7    https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fstatic.azdeq.gov%2F
8    wqd%2Fwqa%2F2022_cwaa_app.xlsx&wdOrigin=BROWSELINK (appendices to
9    Assessment Report, listing Queen Creek as a Priority 5 Impaired Water).

10          6.      EPA recently approved ADEQ's proposed 303(d) list (with objections for
11   waters not relevant here). *See* June 16, 2022 letter from Tomás Torres, Director, EPA Region
12   9 Water Division, to Trevor Baggiore, Director, ADEQ Water Quality Division.  As EPA
13   stated to ADEQ, for Priority 5 Waters such as Queen Creek: "Available data and/or
14   information indicate that at least one designated use is not being support[ed] or is threatened,
15   and a TMDL is needed." EPA Torres letter, at 2.

16          7.      Yet, for years, neither EPA nor ADEQ took actions to promulgate the TMDL
17   for Queen Creek.  And this continues to be the case, despite EPA's statement that "a TMDL
18   is needed" for a Priority 5 Water such as Queen Creek.

19          8.      ADEQ obtained primacy to administer CWA Section 402 discharge permits
20   ("NPDES permits") under the Clean Water Act in 2002. Envtl. Prot. Agency, NPDES State
21   Program Authority (Sept. 20. 2023) https://www.epa.gov/npdes/npdes-state-program-
22   authority.  In doing so, ADEQ agreed, among other things, that it would "[d]evelop and
23   maintain, to the maximum extent possible, the legal authority and the resources required to
24   carry out all aspects of the AZPDES program" and [m]aintain a vigorous program of taking
25   timely and appropriate enforcement action" under the CWA. *See* National Pollutant
26   Discharge Elimination System Memorandum of Agreement Between the State of Arizona
27   and the United States Environmental Protection Agency Region 9 (Dec. 5, 2002)
28

https://www.epa.gov/sites/default/files/2013-08/documents/az-moa-npdes.pdf ("NPDES MOA between State of Arizona and U.S. EPA Region 9").

9. ADEQ's longstanding failure to complete a TMDL for Queen Creek, while simultaneously renewing or reissuing NPDES permits (known in Arizona as "AZPDES permits") that will allow continued waste loading and pollutant discharges into Queen Creek, fails to meet ADEQ's obligations under the law and the commitment it gave to EPA when it secured primacy under Section 402 of the CWA.

10. In fact, ADEQ's failings in administering its obligations under the CWA was recently noted by the Arizona Auditor General, who observed ADEQ "has not … reduced the number of impaired surface waters in the State, limiting its ability to keep these waters safe from pollution." Ariz. Auditor General, <u>Ariz. Dep't of Envtl. Quality, Water Quality Protection Responsibilities</u>, Performance Audit Report No. 21-116 (Sept. 28, 2021) https://www.azauditor.gov/reports-publications/state-agencies/environmental-quality-department/report/arizona-department-4.

11. EPA and ADEQ have long known that Queen Creek does not meet the water quality standards for copper, and that because of this pollution, beneficial uses of the stream are not being protected. Recognizing this, in 2017, ADEQ issued a Draft TMDL for Queen Creek, stating that: "The Arizona Department of Environmental Quality (ADEQ), in accordance with Section 303(d) of the Clean Water Act, has developed a Total Maximum Daily Load (TMDL) analysis for three reaches of Queen Creek located near Superior, Ariz. TMDL's have also been developed for Arnett Creek and two unnamed drainages. ADEQ has determined through sample collection and data analysis that the six separate stream reaches are impaired for dissolved copper." Ariz. Dep't Envtl. Quality, Public Notice No. 17-10 (Sept. 27, 2017) https://www.azdeq.gov/notices/comment-period-begins-extended-tmdl-analysis-three-reaches-queen-creek-arnett-creek-and-two; Ariz. Dep't Envtl. Quality, <u>Queen Creek, Arnett Creek, Unnamed Drainages Total Maximum Daily Loads (TMDL) for Dissolved Copper</u> (Sept. 18, 2017) ("Draft TMDL") https://static.azdeq.gov/pn/draft_tmdl_queen_arnett.pdf.

12. ADEQ further noted the need to promulgate a TMDL for Queen Creek: "The objective of the federal Clean Water Act is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. To fulfill this objective, states assess their surface waters and identify which waters do not meet state surface water quality standards. A TMDL must be completed for each pollutant 'impairing' (or not meeting surface water quality standards) these waterbodies." Ariz. Dep't Envtl. Quality, <u>Fact Sheet Queen Creek Total Maximum Daily Load</u>, Publication No. FS 05-11.

13. Instead of promulgating a TMDL for Queen Creek, ADEQ renewed an AZPDES discharge permit to Resolution Copper for discharges into Queen Creek from the proposed Resolution Copper Project, without the benefit and protections afforded by a TMDL. (Permit No. AZ0020389). The AZPDES permit allows discharges of mine site stormwater from Outfall 001 and discharges of treated mine project water from Outfall 002 (as of 2010) to an unnamed wash, tributary to Queen Creek, located upstream of Boyce Thompson Arboretum and the local community of Queen Valley.

14. Without any plan to remediate the impairments to Queen Creek, and without taking any action since 2017 to complete a TMDL, ADEQ renewed its AZPDES permit for Resolution. That permit renewal was recently vacated by the Arizona appeals court in a case filed by the San Carlos Apache Tribe. *See* <u>San Carlos Apache Tribe v. State</u>, 520 P.3d 670 (Ariz. Ct. App. Nov. 15, 2022). The Arizona Supreme Court is currently reviewing the appeals court decision.

15. Prior to that decision, ADEQ proposed to renew the permit again.

16. ADEQ made an initial attempt to initiate completion of a TMDL, but ADEQ abruptly stopped work on the TMDL by 2018.

17. In September 2018, after nine months of silence following the close of the 2017 Draft TMDL public comment period, ADEQ notified the public that it had stopped work on the Draft TMDL, saying in a public e-mail with the subject: "Queen Creek TMDL Update: Project on Hold." E-mail from ADEQ, to Roger Featherstone, AMRC, "Queen Creek TMDL Update: Project on Hold" (Sept. 27, 2018).

18. In April 2022, a public records request with ADEQ was filed, seeking updated documents and materials on the status of this long-overdue Queen Creek TMDL. In May 2022, the ADEQ Records Division responded, stating that "[t]here has been no movement on completing the Queen Creek TMDL," therefore ADEQ "didn't expect to find any more recent documentation" than the September 2017 Queen Creek TMDL draft.

19. Instead of establishing the TMDL in conformance with the Clean Water Act, ADEQ has instead simply chosen to forego this mandatory requirement. ADEQ has not, however, decided to forego renewal of the AZPDES permit to Resolution Copper, which will result in unlawful copper loading to Queen Creek.

20. ADEQ, and EPA's, failure to promulgate the required TMDL compounds the over 20-year failure of ADEQ and EPA to address the ongoing water quality violations and impairment of Queen Creek. The following timeline highlights the agencies' failures.

21. 2002: Dissolved copper loading found to be exceeding surface water quality in Queen Creek (upper reach). Ariz. Dep't Envtl. Quality, Arizona's 2018 303(d) List https://www.resolutionmineeis.us/sites/default/files/references/adeq-impaired-waters-list-2018.pdf.

22. 2002: ADEQ reportedly began work on Queen Creek TMDL. Draft TMDL, p. 1, ¶ 2.

23. 2004: Dissolved copper loading found to be exceeding surface water quality in Queen Creek (middle reach). Ariz. Dep't Envtl. Quality, Arizona's 2018 303(d) List https://www.resolutionmineeis.us/sites/default/files/references/adeq-impaired-waters-list-2018.pdf.

24. 2005: ADEQ (potentially) submits grant proposal to EPA for federal funding to complete Queen Creek TMDL (est. completion 2007). See ADEQ Grant Proposal dated 2005.

25. Dissolved copper found to be exceeding surface water quality in Queen Creek (lower reach). Ariz. Dep't Envtl. Quality, Arizona's 2018 303(d) List

https://www.resolutionmineeis.us/sites/default/files/references/adeq-impaired-waters-list-2018.pdf.

26. Feb. 2010: ADEQ Publishes Interim Queen Creek TMDL Modeling Report.

27. Jul. 2010: ADEQ e-mail to attorneys for the Inter Tribal Association of Arizona ("ITAA"): "Although we are nearing the end of the project, we still have a few loose ends to account for.  The sampling has shown some hot spots with elevated levels of lead and copper.  We are currently attempting to see if we can verify the numbers and assign a possible source." (Excerpt). E-mail from Kyle Palmer, ADEQ to Montgomery & Interpreter, PLC, "TMDL study for Queen Creek" (July 8, 2010).

28. 2013: Queen Creek TMDL Modeling Report completed for ADEQ by The Louis Berger Group (contracted consultant). *See* Ariz. Dep't Envtl. Quality, Queen Creek TMDL Modeling Report (Jan. 2013) https://static.azdeq.gov/pn/tmdl_modeling_queen_arnett.pdf.

29. Sept. 2017: ADEQ publishes Modeling Report and Draft TMDL for Three Reaches of Queen Creek, Arnett Creek and Two Unnamed Drainages. Public comments closed Dec. 2017.

30. Sept. 2018: ADEQ sends the following e-mail: "Greetings Interested Parties, Thank you for your interest in the Queen Creek TMDL project. Following two public meetings held by ADEQ to discuss the draft report, written feedback was gathered which revealed technical issues needing to be addressed.  In order to best achieve our mission to protect public health and the environment of Arizona, ADEQ is suspending normal project activities until these issues can be completely resolved.  Once resolved, we will provide an update and the TMDL project can move forward." E-mail from ADEQ to Roger Featherstone, AMRC, "Queen Creek TMDL Update: Project on Hold" (Sept. 27, 2018).

31. April 2021 (approx.): EPA sends what is referred to by ADEQ as a PPG Warning Letter inquiring what work ADEQ has done in lieu of the Queen Creek TMDL.

32. April 2022: ADEQ proposes to renew the Queen Creek AZPDES discharge permit to Resolution.

33. May 2022: In response to a Public Records Request for updated TMDL materials, ADEQ states: "Per the programs, the TMDL document they have for Queen Creek is dated September 18, 2017. Since there has been no movement on completing the Queen Creek TMDL, They didn't expect to find any more recent documentation. The TMDL is officially on pause until it is reestablished by the TMDL program." E-mail from Jesus Barreras, ADEQ to Alexandra Corcoran, Montgomery & Interpreter, PLC (May 17, 2022).

34. June 2022: EPA approves ADEQ 303(d) list, recognizing ADEQ's ranking of Queen Creek as a "low" or "medium" priority for issuing a TMDL, but with no plans for development of the TMDL.

35. Thus, for at least 20 years, EPA has been aware of ADEQ's failure to prepare the required TMDL for Queen Creek, yet EPA has taken no substantive action to prepare a TMDL, or require ADEQ to prepare one.

36. In doing so, EPA has violated its mandatory duty under CWA section 303(d), 33 U.S.C. § 1313(d)(2), to develop a TMDL for Queen Creek.

## JURISDICTION AND VENUE

37. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question), and 33 U.S.C. § 1365(a)(2) (Clean Water Act). The relief requested herein is authorized by 33 U.S.C. § 1365(a).

38. In accordance with the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), Plaintiffs notified Regional Administrator of the EPA in San Francisco, Defendant Martha Guzman, and EPA headquarters in Washington, D.C., of its violations of the CWA and of Plaintiffs' intent to sue under the CWA by letter dated, mailed and postmarked, and e-mailed, August 9, 2022 ("Notice Letter"). At the time of the filing of this Complaint, more than sixty (60) days have passed since the Notice Letter was issued.

39. Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred in this District as Queen Creek is located in Arizona. Plaintiffs AMRC, Concerned Citizens and

Retired Miners Coalition, and the Grand Canyon Chapter of the Sierra Club have their offices in Arizona.

## PARTIES

40. The Plaintiffs in this action are the parties that submitted the 60-day notice to Regional Administrator Guzman and EPA.

41. **Arizona Mining Reform Coalition** works in Arizona to improve state and federal laws, rules, and regulations governing hard rock mining to protect communities and the environment. AMRC works to hold mining operations to the highest environmental and social standards to provide for the long term environmental, cultural, and economic health of Arizona. Members of the Coalition include: the Center for Biological Diversity, Concerned Citizens and Retired Miners Coalition, Concerned Climbers of Arizona, Courtland Ghost Town, Dragoon Conservation Alliance, Earthworks, Environment Arizona, Groundwater Awareness League, Maricopa Audubon Society, Save the Scenic Santa Ritas, Grand Canyon Chapter of the Sierra Club, Sky Island Alliance, Tucson Audubon Society, Arizona Trail Association, and the Valley Unitarian Universalist Congregation.

42. The **Concerned Citizens and Retired Miners Coalition** is a group of citizens who: 1) reside in Superior, Arizona, or do not reside in Superior, Arizona, but are affiliated with relatives who are residents; or 2) are retired hard-rock miners who previously worked in the now non-operational mine in Superior, Arizona, and were displaced due to mine closure or personal disability; and 3) are individuals who are concerned about protecting Queen Creek and surrounding lands and waters, especially from the environmental impacts caused by the proposed Resolution Copper Mine.

43. **Earthworks** is a nonprofit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions. Earthworks stands for clean air, water and land, healthy communities, and corporate accountability. We work for solutions that protect both the Earth's resources and our communities.

44. The **Center for Biological Diversity** is a non-profit public interest organization with headquarters located in Tucson, Arizona, representing more than 84,000 members nationwide dedicated to the conservation and recovery of threatened and endangered species and their habitats. The Center has long-standing interest in projects of ecological significance undertaken in the National Forests of the Southwest, including mining projects.

45. **Sierra Club** is one of the nation's oldest and most influential grassroots organizations whose mission is "to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments." Sierra Club has more than 3.7 million members and supporters with more than 12,000 members in Arizona as part of the Grand Canyon (Arizona) Chapter. Our members have long been committed to protecting and enjoying the Tonto National Forest, Arizona waters, and have a significant interest in the proposed Resolution Copper Mine and related activities.

46. Plaintiffs' members regularly use and enjoy the waters and adjacent lands in and along Queen Creek that have been designated as impaired by ADEQ's 303(d) list. Plaintiffs' members have definite future plans to continue using them for recreational, scientific, aesthetic, spiritual, conservation, educational, employment, and other purposes, including wading, picnicking, and watching and enjoying wildlife in and along the Creek. The use and enjoyment that Plaintiffs' members derive from using the waters of Queen Creek is diminished by the effects of pollution, including the copper and other pollutants that exist, and would be added by Resolution Copper's discharges into Queen Creek and the failure of EPA to establish a TMDL for Queen Creek. Plaintiffs' members would derive more benefits and enjoyment from their use of these waters if these pollutants were not adversely affecting water quality and aquatic and aquatic-dependent species in these waters.

47. EPA's failure to establish a TMDL for Queen Creek at issue in this lawsuit puts these uses, and the associated impacts to Queen Creek, at risk and threatens or negatively affects the interests of Plaintiffs' members.

48. The recreational, aesthetic, conservation, employment, scientific, and other interests of Plaintiffs and their members have been, are being, and unless relief is granted, will continue to be adversely affected and irreparably injured by EPA's failure to comply with the CWA.

49. At all relevant times, Plaintiffs were and are "persons" as the term is defined by the Clean Water Act, 33 U.S.C. § 1362(5).

50. Defendant MARTHA GUZMAN is the Administrator of Region 9 of the EPA with offices in San Francisco, with jurisdiction over CWA administration in Arizona. In accordance with the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), Plaintiffs notified Ms. Guzman of her, and EPA's, violations of the CWA and of Plaintiffs' intent to sue under the CWA by letter dated, mailed and postmarked, and e-mailed, on August 9, 2022 ("Notice Letter").

51. Defendant U.S. ENVIRONMENTAL PROTECTION AGENCY ("EPA") is the federal agency charged with the administration of the CWA, and specifically with approving or disapproving state identification of impaired waters and state TMDL submissions under section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2). Defendant MICHAEL REGAN is the Administrator of the EPA, with authority over EPA's actions and inactions in this case.

**THE CLEAN WATER ACT**

52. In 1972, Congress passed the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters . . . ." 33 U.S.C. § 1251(a). To meet these goals, states establish water quality standards that protect specific uses of waterways. 33 U.S.C. § 1313(a)–(c).

53. CWA section 303(d)(2) requires states to "submit to the Administrator from time to time" a list of "waters identified and loads established under" subsections 303(d)(1)(A)-(D), including, among other components, a list of waters for which technology-based effluent limitations "are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(2); *see also* 40 C.F.R. §§ 130.7(b); 130.10(b), (d).

54. Such waters are called "water quality limited" or "impaired" waters. 40 C.F.R. § 131.3(h) ("Water quality limited segment means any segment where it is known that water quality does not meet applicable water quality standards, and/or is not expected to meet applicable water quality standards."

55. EPA has promulgated rules that establish the frequency of such submissions, consistent with the statute. Every two years states must compile their list of impaired waters and submit them to EPA for approval. 33 U.S.C. § 1313(d)(1)(A), (d)(2). These lists are commonly called "303(d) lists" in reference to section 303(d) of the CWA, 33 U.S.C. § 1313(d).

56. The 303(d) lists serve several important functions, in addition to identifying which waterbodies must receive the required TMDL clean-up plans. The list provides the public and local governments with specific information about the health of the waterbodies throughout the state and identifies which waterbodies may not be safe to use. The list identifies where improved nonpoint source controls of polluted runoff from land activities, such as farming and logging, are needed, as well as priorities for habitat restoration. Finally, when a waterbody is listed as water quality-limited/impaired, additional protections are triggered under the CWA's NPDES permitting requirements to ensure impaired waters are not further degraded. *See* 40 C.F.R. §§ 122.4, 122.44. *See also* Friends of Pinto Creek v. U.S. E.P.A., 504 F.3d 1007, 1013 (9th Cir. 2007).

57. For purposes of listing impaired waters, the applicable water quality standards include waters' designated uses, numeric criteria, narrative criteria, and antidegradation requirements. 40 C.F.R. § 130.7(b)(3).

58. In order to identify water quality-limited segments, each state, at a minimum, must "assemble and evaluate all existing and readily available water quality-related data and information" for certain categories of waters that include, but are not limited to, "those for which water quality problems have been reported by local, state, or federal agencies; members of the public; or academic institutions." 40 C.F.R. § 130.7(b)(5), (b)(5)(iii).

59. "The Regional Administrator shall approve a list developed under § 130.7(b) . . . only if it meets the requirements of § 130.7(b)." 40 C.F.R § 130.7(d)(2).

60. A state must submit an updated impaired waters list to EPA on April 1 of every even-numbered year. 40 C.F.R. § 130.7(d)(1). States submit these lists to EPA for approval or disapproval. 33 U.S.C. § 1313(d)(2). EPA must act on the list within 30 days; if it disapproves the list, EPA must establish a replacement list within 30 days of the disapproval. 33 U.S.C. § 1313(d)(2).

61. For each of their 303(d)-listed impaired waters, states must establish a "total maximum daily load" ("TMDL") of pollutants "at a level necessary to implement the applicable water quality standards[.]" 33 U.S.C. § 1313(d)(1)(C). To encourage prompt state action even where water quality data are imperfect, the CWA requires that TMDLs include a "margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." Id.

62. States are required to "establish a priority ranking" for their 303(d)-listed impaired waters, "taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.7(b)(4). States "shall establish" TMDLs "in accordance with the priority ranking." 33 U.S.C. § 1313(d)(1)(C). "Schedules for submission of TMDLs shall be determined by the Regional Administrator and the State." 40 C.F.R. § 130.7(d)(1).

63. A TMDL is the total daily loading of a pollutant for a particular waterbody or segment. *See* 40 C.F.R. §130.2(i). The total amount of a pollutant that may enter a waterbody while ensuring the waterbody is still meeting water quality standards is called its "loading capacity." 40 C.F.R. § 130.2(f).

64. After calculating a waterbody's loading capacity, a TMDL then distributes portions of the total loading capacity to individual sources or categories of pollution sources, like dividing up a pie. These allocations include both "load allocations" for nonpoint sources and "wasteload allocations" for point sources of pollution. 40 C.F.R. § 130.2(i). The purpose of load and wasteload allocations is to allocate the total amount of pollution that may enter a waterbody between all the sources of pollution, including both point and nonpoint sources, thereby restricting pollution inputs sufficiently to attain and maintain water quality standards. 40 C.F.R. § 130.7(c).

65. A TMDL is the CWA mechanism designed to ensure that assumptions about nonpoint source load reductions that "make more stringent load allocations practicable, then wasteload allocations can be made less stringent." 40 C.F.R. § 130.2(i). In this way, "the TMDL process provides for nonpoint source control tradeoffs." Id. Without "reasonable assurance" that nonpoint source controls will be implemented, TMDLs must require maximum pollution controls from NPDES permitted sources.

66. As with water quality standards and impaired waters lists, states must submit TMDLs to EPA for approval or disapproval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.2(d). EPA must act on the TMDL submission within 30 days, and if it disapproves the TMDL, EPA must establish a replacement TMDL within 30 days of the disapproval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2) ("If the Regional Administrator disapproves such listings and loadings, he shall, not later than 30 days after the date of such disapproval, identify such waters in such State and establish such loads for such waters as determined necessary to implement applicable [water quality standards].").

67. Subsequent to EPA approval of TMDLs, the permitting authority for a state must ensure that "[e]ffluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocations for the discharge prepared by the State and approved by EPA pursuant to 40 CFR 130.7." 40 C.F.R. § 122.44(d)(1)(vii)(B). The approved load allocations serve as the basis for state and local programs for controlling

1  nonpoint source pollution, including state programs that receive federal funds under CWA
2  section 319, 33 U.S.C. § 1329.  Once EPA approves a TMDL, the state must also incorporate
3  the TMDL into its "continuing planning process" under CWA section 303(e), 33 U.S.C. §
4  1313(e)(3)(C).

5        68.      Section 303(d) of the CWA "expressly requires the EPA to step into the
6  states' shoes if their TMDL submissions . . . are inadequate." <u>Alaska Center for the Envt. v.
7  Reilly</u>, 762 F. Supp. 1422, 1429 (W.D. Wa. 1993).  Further, because "Congress prescribed
8  early deadlines for the TMDL process," appropriate TMDL schedules must be counted in
9  "months and a few years, not decades." <u>Idaho Sportsmen's Coalition v. Browner</u>, 951 F.
10 Supp. 962, 967 (W.D. Wa. 1996).

11       69.      Congress intended for TMDLs to be developed promptly, without undue
12 delay. 33 U.S.C. § 1313(d).

13       70.      EPA's obligation to review and either approve or disapprove a state-
14 submitted TMDL is a non-discretionary duty. *See* <u>San Francisco BayKeeper v. Whitman</u>,
15 297 F.3d 877, 880 (9th Cir. 2002), and the district courts have jurisdiction to "order the
16 Administrator to perform such act or duty" under the CWA's citizen suit provision, 33
17 U.S.C. § 1365(a)(2).

18       71.      Arizona's TMDL statutes (A.R.S. § 49-231 *et seq*.) require that 303(d)-listed
19 impaired waters be developed within at least 15 years: "Total maximum daily loads that are
20 required to be developed for WOTUS that are included for the first time on subsequent lists
21 shall be developed within fifteen years of the initial inclusion of the water on the list." A.R.S.
22 § 49-233(B).

23       72.      This has not occurred for Queen Creek.

24       73.      According to ADEQ: Category 5 waters are defined as those: "<u>Not supporting
25 for one or more designated uses by a pollutant, and a TMDL needs to be developed or
26 revised</u>:  Assessment units with at least one designated use classified as not supporting and a
27 Total Maximum Daily Load analysis needs to be completed. The assessment unit remains in
28 Category 5 until EPA has approved the TMDL or the pollutant is otherwise delisted. Only

15

1  category 5 waters are placed on the 303(d) impaired water's list (Appendix C)." Arizona
2  Dep't of Envtl. Quality, <u>Arizona's 2022 Clean Water Act Assessment (July 1, 2012 to June
3  30, 2021) Integrated 305(b) Assessment and 303(d) Listing Report</u> (revised Dec. 2021),
4  Chapter 3-20, (Arizona's current (2022) 303(d) List of Impaired Waters)
5  https://static.azdeq.gov/pn/pn_draft2022cwaa.pdf.

6     74.     Queen Creek is listed as impaired (Category 5) in Appendix C of ADEQ's
7  current 303(d) List.
8  https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fstatic.azdeq.gov%2F
9  wqd%2Fwqa%2F2022_cwaa_app.xlsx&wdOrigin=BROWSELINK.

10     75.     "Where a state has failed to develop and issue a particular TMDL for a
11  prolonged period of time, and has failed to develop a schedule and credible plan for
12  producing that TMDL, it has no longer simply failed to prioritize this obligation.  Instead,
13  there has been a constructive submission of no TMDL, which triggers the EPA's mandatory
14  duty to act." <u>Columbia Riverkeeper v. Wheeler</u>, 944 F.3d 1204, 1211 (9th Cir. 2019).

15     76.     "We reaffirmed this principle in *City of Arcadia v. U.S. Environmental
16  Protection Agency*, holding that '[t]he EPA is also under a mandatory duty to establish a
17  TMDL when a State fails over a long period of time to submit a TMDL; this prolonged
18  failure can amount to the constructive submission of an inadequate TMDL, thus triggering
19  the EPA's duty to issue its own.'" 411 F.3d 1103, 1105 (9th Cir. 2005)(internal quotation
20  marks omitted)." <u>Columbia Riverkeeper</u>, at 1208

21     77.     "This constructive submission of no TMDL triggers the EPA's duty to
22  develop and issue its own TMDL within 30 days, and it has failed to do so. The time has
23  come—the EPA must do so now." <u>Columbia Riverkeeper</u>, at 12011-12.

24     78.     This is the situation at Queen Creek, as ADEQ has failed to promulgate the
25  Queen Creek TMDL, since at least 2017, and indeed since Queen Creek has been on the
26  303(d) list since 2002.

27     79.     To date, EPA has taken no substantive action to prepare a TMDL for Queen
28  Creek.

80. EPA currently has no plans to prepare a TMDL for Queen Creek.

81. Under the "constructive submission doctrine," EPA has a "mandatory duty to act," and its failure to prepare a TMDL for Queen Creek violates the CWA.

### Judicial Review under the Clean Water Act's Citizen Suit Provision

82. The CWA authorizes citizen suits against the EPA Administrator "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2).

83. The district courts have jurisdiction over suits against the Administrator arising under the citizen suit provision and may "order the Administrator to perform such act or duty" the non-performance of which is the basis for the claim. 33 U.S.C. § 1365(a).

### FIRST CAUSE OF ACTION

84. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

85. Under the "constructive submission doctrine," the CWA, and its implementing regulations, EPA has a mandatory duty to act to prepare a TMDL for Queen Creek, which EPA has failed to do.

86. EPA's failure to promulgate a proper TMDL for Queen Creek violates the CWA and its implementing regulations.

87. Based on EPA's failures, this Court should "order the Administrator [EPA] to perform such act or duty." 33 U.S.C. § 1365(a).  This duty includes the prompt preparation and issuance of a legally-compliant TMDL for Queen Creek.

### REQUEST FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court:

A. Declare that the EPA has violated the Clean Water Act, and the implementing regulations and policies, by failing to prepare a legally-compliant TMDL due to ADEQ's constructive submission of no TMDL;

B. Order EPA to promptly issue a lawful TMDL for Queen Creek;

C.    Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees under the Clean Water Act, 33 U.S.C. § 3615(d); and

D.    Grant such additional relief as this court deems equitable, just, and proper.

Respectfully submitted this 27th day of September, 2023,

*/s/ Susan Montgomery*
Susan B. Montgomery (AZ Bar # 020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com

*/s/ Roger Flynn*
Roger Flynn (Pro Hac Vice Application To Be Filed)(CO Bar # 21078)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
roger@wmaplaw.org

*/s/ Allison N. Henderson*
Allison N. Henderson (Pro Hac Vice Application To Be Filed)(Co Bar # 45088)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Counsel for Plaintiffs*